## UNITED STATES of America, Plaintiff,

v.

## UNITED STATES CURRENCY TOTALING $87,279 AND CASHIER'S CHECKS TOTALING $15,000, Defendant.

Civ. A. No. CV 281–136.

United States District Court,
S. D. Georgia,
Brunswick Division.

Aug. 24, 1982.

---

G. R. Smith, Asst. U. S. Atty., Savannah, Ga., for plaintiff.

Grayson P. Lane, Brunswick, Ga., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALAIMO, Chief Judge.

This case is an *in rem* forfeiture proceeding brought pursuant to 21 U.S.C. § 881(a) to confiscate certain checks and monies totaling $102,279. The action came on for bench trial in Brunswick, Georgia, on March 12 and 19, 1982. The Court having considered the evidence presented, now makes the following findings:

## FINDINGS OF FACT

### 1.

At approximately 6:00 p.m., on September 3, 1981, Trooper Lamar Calhoun, a Georgia State Patrolman traveling north on Interstate 95 ("I–95") in Glynn County, Georgia, pulled over a 1980 brown Jeep Cherokee which was traveling south at the excessive speed of 84 miles per hour. The driver, who identified himself as "Kevin C. Keegan" was arrested for speeding and driving under the influence. A passenger, who identified himself as Trevor Steadman, was arrested for obstruction of an officer. Pursuant to the arrest, Calhoun searched the car and discovered two wrinkled, brown paper bags, each filled with cash.

### 2.

After requesting a backup unit be dispatched to where the Jeep was parked, Trooper Calhoun transported his passengers to the Glynn County Police Department, where they were charged with the aforementioned misdemeanor offenses and placed in a lockup.

### 3.

At approximately 9:00 p. m. that evening, a privately owned wrecker service, under the supervision of two county police officers who had been dispatched to the scene of the arrest, towed the Jeep to the Glynn County Police Department. Once it arrived, Trooper Calhoun conducted an inventory search of the vehicle. The inventory search was conducted pursuant to the written policy of the Georgia State Patrol. The Georgia Department of Public Safety Policy Manual states that all public safety personnel who impound a vehicle "shall" inventory its contents, searching "all parts of the vehicle where valuables may be stored." During the inventory, Trooper Calhoun, assisted by Special Agent J. F. Jordan of the Georgia Bureau of Investigation ("GBI"), located inside the spare tire storage compartment four brown paper bags which resembled the bags earlier found by Trooper Calhoun. These bags, at least one of which was partially open, also contained large sums of currency. In the pocket of a green windbreaker, Trooper Calhoun found thirteen $10 Federal Reserve Notes which were packaged similar to the currency found in the bags. In the front of the Jeep, Special Agent Jordan found three hand-rolled cigarettes and a small, clear package containing a green leafy material, both of which were later identified as marijuana by the Georgia State Crime Lab.

### 4.

Agents of the Customs Patrol Office and Special Agent Dennis Craig of the Drug Enforcement Administration ("DEA") were later called in to assist Trooper Calhoun in counting the money found in the bags. According to Agent Craig, it is customary for the DEA to be asked to assist local police when large sums of money are found. The agents counted a total of $87,279 in United States currency. Most of the money was wrapped in unique $1,000 bundles, containing ten smaller bundles of $100 each and secured with rubber bands. The bags discovered by Trooper Calhoun contained $11,505 and $15,045, respectively. The agents also found several receipts and miscellaneous papers referring to a building in Philadelphia, Pennsylvania.

### 5.

At approximately 8:00 p. m., on September 3, 1981, Special Agent Jordan, after advising "Keegan" and Steadman of their constitutional rights, asked them who owned the Jeep in which they had been traveling. Steadman stated that the vehicle belonged to him and again stated that he had "valuables" in the Jeep and that he wanted the vehicle "towed in." After the inventory had been completed, Special Agent Jordan again advised Steadman and "Keegan" of their constitutional rights and asked them how much money they had in the Jeep. Steadman replied that he had no idea how much money was in the vehicle.

### 6.

During the course of the evening of September 3, Glynn County Police had conver-

sations with Special Agents Gordon Raynor and Kelly Goodowens of the DEA about what to do with the money. It was agreed that the Glynn County District Attorney would make the initial decision whether to proceed with a forfeiture proceeding under state law.

7.

On the morning of Friday, September 4, Chief Assistant District Attorney for the Brunswick Judicial Circuit, John B. Johnson, III, was informed about the prior evening's events. He believed that a complete search of the Jeep pursuant to a warrant would yield more contraband, enough to allow for a forfeiture proceeding under state law. He decided to file a libel for condemnation proceeding that very day, so that Steadman could be served before he was released. On Friday afternoon, a condemnation complaint was filed in Georgia Superior Court for the Brunswick District.

8.

On the morning of September 4, 1981, the Honorable William R. Killian, Georgia Superior Court Judge, issued a search warrant for the Jeep based on an affidavit executed by Detective Carl Alexander of the Glynn County Police Department. The search made pursuant to this warrant was conducted late that afternoon. During the search, the officers found a cashier's check (No. 154455) in the amount of $5,000 issued to Peir [sic] Three, Inc.; a cashier's check issued to Angela Henry (No. M144553); and a cashier's check (No. M144556) in the amount of $7,000 to Peir [sic] Three, Inc. The officers also found a number of traffic citations and a photocopy of a Massachusetts driver's license in the name of Warren F. Hall, Jr.

9.

Also on the morning of September 4, 1981, Steadman and "Keegan" were interviewed by a U. S. Border Patrol Agent, who learned that "Keegan's" real name was Wayne Newland and that both Newland and Steadman were Jamaican nationals who had entered the United States as non-preferential immigrants.

10.

On the afternoon of September 4, 1981, after Steadman and Newland had made bond, GBI Special Agent Jordan, DEA Special Agent Dennis Craig and Customs Patrol Officer James Miller processed and interviewed Newland and Steadman at the Glynn County Jail, Brunswick, Georgia. Processing entails taking the suspects' biographical history, fingerprinting and photographing. Prior to processing, the agents informed Steadman's attorneys what they were about to do. The attorneys did not protest the procedure and sat in on parts of it. Steadman and Newland were again advised of their constitutional rights and were asked to sign a form confirming the advisement, which they did. Steadman stated that he was willing to answer questions. During the processing with Agent Craig, Steadman was asked if he ever used illegal narcotics. This is a standard processing question which enables the officer to gauge whether the suspect has any drug addictions and is in need of treatment. Steadman indicated that he smoked marijuana frequently. Steadman then volunteered that he was a member of the Rastafarian religious group that originated in Jamaica and that operates in this country out of New York City, Boston, Philadelphia and Miami. Steadman stated that Rastafarians utilize marijuana as a sacrament and that he was not in violation of law for possessing marijuana. He further stated that the Rastafarian organization was in the business of importing marijuana from Jamaica to the United States both for the personal consumption of its members and for purposes of sale to "rich Americans." Steadman described in detail how the Rastafarian members conducted their "street" sales of marijuana. He stated that the proceeds from these illicit sales of marijuana were used to financially support the sect and to help poor people in Jamaica. Steadman implied that the money found by Trooper Calhoun at the

roadside and during the inventory search was derived from the sale of marijuana. When Special Agent Craig informed him that these transactions were in violation of the laws of the United States, Steadman replied that "[t]here are a lot of Christians in jail." When Special Agent Craig advised Steadman that, because the money in his possession had been used in drug trafficking, it was subject to forfeiture to the United States, Steadman replied that money "doesn't mean anything to me personally but it does to my people." Steadman emphasized that marijuana is in great demand in the United States and that Rastafarians "are only supplying the needs of the people."

11.

After processing was concluded by Agent Craig, Steadman was processed by state authorities. During this period, Agent Craig sat in a chair in the hallway of the Glynn County Police Department. Following processing, as Steadman was leaving, he spotted Craig, approached him and tapped him on the leg, saying "you would make a good Rastafarian." He then reiterated all the comments about the group and specifically said that the money found in his car came from drug sales by Rastafarians in the Philadelphia and Boston areas, except for $3,000 which was derived from the sale of a vehicle to a Rastafarian friend. He further stated that all of the money was to be deposited in a Miami bank, where it would then be used to purchase real estate and legal businesses, creating other jobs for Rastafarians.

12.

On September 15, 1981, Special Agent Craig contacted the DEA's Boston Regional Office seeking information regarding Steadman. The Boston DEA office informed Agent Craig that Steadman and Angela Henry (whose name appears on one of the cashier's checks found in the Jeep) had been arrested by the Boston Police Department on October 23, 1978, for possessing marijuana with intent to distribute and for unlawfully possessing a pistol. This arrest resulted in the seizure of 45 pounds of marijuana and $3,000 in United States currency.

13.

Documents found during the inventory search of the Jeep indicated that Steadman had purchased property located at 5701 Warrington Avenue, Philadelphia, Pennsylvania. When contacted later by Agent Craig, the DEA's Philadelphia office stated that the property at that address is located in a high-crime area populated by Rastafarians engaged in narcotics trafficking.

14.

On the morning of Tuesday, September 7, 1981 (Monday, September 6 was the Labor Day holiday), Assistant District Attorney Johnson received the results of Friday afternoon's search. He concluded that he did not have sufficient evidence of contraband to proceed with a forfeiture case under Georgia law. He told Detective Alexander to contact the DEA in Savannah and obtain letters from them indicating the DEA's intent to have the United States Attorney bring a forfeiture action in federal court. Later that day, or on Wednesday, September 9, Johnson received two letters to this effect from DEA Agent Kelly Goodowens. On September 9, Johnson filed an order in Brunswick Superior Court dismissing the condemnation action; and the fruits of the searches, including all cash and currencies, were turned over to the DEA. The DEA gave a receipt to the state authorities for the items. On November 5, 1981, the instant proceeding was filed.

CONCLUSIONS OF LAW

1.

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1345, 1355 and 21 U.S.C. § 881. Venue is properly found in the Southern District of Georgia under 28 U.S.C. § 1395.

2.

Under the provisions of 21 U.S.C. § 881(a)(6), the United States is entitled to

seize and forfeit "all moneys, negotiable instruments, securities, or other things of value" which are (1) "furnished or intended to be furnished in *exchange*" for an illegal drug, (2) which are "proceeds *traceable* to such an exchange," or (3) which are used or "intended to be used to *facilitate*" any illegal drug transaction.

3.

To secure a forfeiture of property under § 881(a)(6), the Government need only establish "probable cause for belief that a substantial connection exists between the property to be forfeited and the criminal activity defined by the statute." *United States v. $364,960*, 661 F.2d 319, 323 (5th Cir. 1981). The test for determining probable cause for forfeiture is the same as that which applies to arrests, searches and seizures: the Government must show "a reasonable ground for the belief of guilt, supported by less than prima facie proof but more than mere suspicion." *Id.*

4.

Once this threshold is met, the burden of proof shifts to the party claiming the property to prove, by a preponderance of the evidence, that the property was not used or intended to be used unlawfully. *United States v. One 1975 Ford Pickup Truck*, 558 F.2d 755 (5th Cir. 1977); *United States v. (One) 1971 Chevrolet Corvette Auto.*, 496 F.2d 210 (5th Cir. 1974).

5.

Hearsay evidence is admissible in a forfeiture proceeding to the same extent that it is admissible in any other "probable cause" hearing. *Bush v. United States*, 389 F.2d 485 (5th Cir. 1968).

6.

Moreover, even if the property is improperly seized, or illegally discovered by an unconstitutional search and seizure, if the Government is able to put forth legal evidence establishing probable cause that the property *was* used illegally, and this evidence is not rebutted, forfeiture is nevertheless proper. *U. S. v. One 1975 Pontiac Lemans*, 621 F.2d 444, 450–451 (1st Cir. 1980); *U. S. v. Carey*, 272 F.2d 492, 492–494 (5th Cir. 1959); *U. S. v. $22,287.00*, 520 F.Supp. 675 (E.D.Mich.1981).

7.

Once Trooper Calhoun had made a determination to place Newland under arrest for speeding and for driving while intoxicated and Steadman for obstruction of an officer, the Trooper was justified in searching the passenger compartment of the vehicle. *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). Any container found during the course of the search incident to the lawful arrest may be searched whether it is open or closed. *Id.* His discovery of the two brown paper bags filled with cash was, therefore, proper.

8.

A warrantless inventory search of a vehicle made pursuant to standard police procedures is a reasonable intrusion which does not offend Fourth Amendment principles. *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). Because it is the policy of the Georgia State Patrol to inventory all impounded vehicles, Trooper Calhoun was justified in searching the vehicle once it was towed to the county police department. The search of the trunk, including the empty spare tire compartment, was also reasonable, because these are areas where valuables may be stored.

9.

The fact that Trooper Calhoun may have suspected that contraband or other evidence would be found in the vehicle did not vitiate the otherwise reasonable inventory search. *United States v. Staller*, 616 F.2d 1284, 1290 (5th Cir.), *cert. denied*, 449 U.S. 869, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980).

## 10.

 Steadman's admissions to DEA Special Agent Dennis Craig and GBI Agent Jordan, made after being advised of his constitutional rights, establish that the money discovered in the Jeep, except for $3,000 which was claimed as payment for the sale of an auto, was used in violation of the Controlled Substances Act, 21 U.S.C. § 881(a)(6).

## 11.

 Although it is unethical for a United States Attorney or a Government agent to question a defendant outside the presence of counsel when he is aware that counsel has been retained, and some judges have suggested that the fruits of such questioning should be barred from evidence, *U. S. v. Brown*, 569 F.2d 236, 249–250 (5th Cir. 1978) (en banc) (Simpson, Goldberg, Godbold, Morgan, JJ., dissenting); *U. S. v. Four Star*, 428 F.2d 1406, 1407 (9th Cir. 1970) (per curiam), the facts of this case do not indicate any ethical violation. Steadman's attorneys were given advance warning of the questioning, and they consented and listened to parts of it. Further, Steadman's conversation with Craig in the police station hallway was not a product of questioning, but was wholly volunteered by Steadman.

## 12.

 The Court concludes that the Government has established probable cause to believe that the currency seized from the Jeep, except for $3,000, was furnished in exchange for an illegal drug, was proceeds traceable to such an exchange and was used or intended to be used to facilitate violations of the Controlled Substances Act. 21 U.S.C. § 881(a)(6).

## 13.

 The Court further concludes that the evidence used to establish probable cause for forfeiture was legally obtained by the arresting officer and the other state and federal agents who participated in the case. Therefore, even if the contraband was not properly discovered by the state or seized by the DEA, there is proper evidence to seize the monies and the proceeding is not barred.

## 14.

Because the claimant has not borne the burden of rebutting the Government's evidence that the property was used illegally, the property, except for $3,000, is declared to be forfeitable to the United States. 19 U.S.C. § 1615.

## 15.

 The due process clause of the Fifth Amendment requires that forfeiture actions under § 881 be brought promptly. *U. S. v. One Motor Yacht Named Mercury*, 527 F.2d 1112, 1114 (1st Cir. 1975). The decision must be made by reference to the totality of circumstances of the case. *Id.* Given Steadman's involvement with the Rastafarian sect, his prior drug offenses and testimony by Agent Craig that, following the seizure, the DEA continued to investigate Steadman, the Court concludes the two-month delay between seizure and the filing of this suit was constitutionally permissible.

## 16.

The Court hereby ORDERS all monies seized, except for $3,000, to remain in the custody of the Attorney General and disposed of pursuant to 21 U.S.C. § 881(e).