**UNITED STATES of America, Plaintiff,**

**v.**

**TWO HUNDRED EIGHTY THOUSAND FIVE HUNDRED AND FIVE DOLLARS, etc., et al., Defendants.**

**No. 82–2230–Civ.**

United States District Court,
S.D. Florida,
Civil Division.

June 19, 1986.

---

Patricia D. Kenny, Chief, Civil Div., U.S. Atty. Office, Miami, Fla., for plaintiff.

Philip Carlton, Jr., Law Offices of Carlton & Carlton, Miami, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOEVELER, District Judge.

THIS CAUSE was tried to the Court, non-jury, in July, 1984. The Court heard testimony, received exhibits, as well as argument from counsel. After study of the trial proceedings and consideration of the applicable law, the Court makes its Findings of Fact and publishes its Conclusions of Law.

### FINDINGS OF FACT

1. This case comes before this Court as a civil forfeiture action against the defendant currency, TWO HUNDRED EIGHTY THOUSAND SIX HUNDRED EIGHTY FIVE DOLLARS ($280,685.00) in U.S. currency and against the defendant 1982 BMW 528E automobile.[1]

---

1. There appears to be a question as to the correct amount of the currency. The final count was $280,685.00.

2. On October 21, 1982, the United States filed a Complaint for Forfeiture in Rem which alleged that on or about July 6, 1982, Dade County police officers seized the defendant currency, TWO HUNDRED EIGHTY THOUSAND SIX HUNDRED EIGHTY FIVE DOLLARS ($280,685.00). The complaint alleges that the currency was money furnished or intended to be used to facilitate a narcotics violation under 21 U.S.C. § 881(a)(6).

3. The complaint further alleged that on August 20, 1982, Special Agent John Howard of the United States Customs Service seized the defendant BMW pursuant to a seizure warrant issued by a United States Magistrate because the BMW had been used or was intended for use to transport or to facilitate the transportation, sale, receipt, possession or concealment of a controlled substance within the meaning of 21 U.S.C. § 881(a)(4) and had been purchased with proceeds derived from drug trafficking in violation of 21 U.S.C. § 881(a)(6).

4. Evidence produced by the plaintiff disclosed that on July 6, 1982, Dade County Police Officers Thomas Turpin and Robert Shipley responded to a radio call of gunshot fire near 401 N.W. 140 Street, Miami. As the officers arrived in the area, they observed claimant Mark Gidus ("Gidus") driving the defendant BMW east on 140th Street and N.W. 5th Avenue. Apparently, seeing the police, Gidus fled north on N.W. 5th Avenue. Although Officer Shipley could not testify positively that the police unit's siren had been operating, Officer Turpin testified that the siren had been on. Both officers testified that the police unit's lights had been operating, and that Gidus continued to flee from them at excessive speed. There was further testimony that he left the roadway and drove on residential property, continued to disobey stop signs and endangered the life of at least one pedestrian. Gidus admitted that he saw the police unit behind him for at least one block prior to stopping. He testified that he did not stop immediately upon seeing the police unit because he did not want to drive on private lawns. As noted, he had already done so.

5. Gidus' vehicle came to a stop in the driveway of 14711 South Biscayne River Drive. He was told to get out of the vehicle and was arrested for reckless driving and willfully fleeing a police officer. An officer testified Gidus appeared to be extremely nervous and was sweating profusely. During a safety search of the vehicle for weapons (as indicated, gun shots had been reported in the area from which Gidus had come), a metal suitcase was found on the left rear floorboard. The suitcase is of the type used to contain weapons. When Gidus was asked about the contents of the suitcase, he replied that it was not his. He was then advised of his *Miranda* rights and was again asked about the suitcase. He again responded that it was not his and that it belonged to someone he knew, although he did not state the individual's name. He then changed his response and stated that it was his. When asked what was in the suitcase, Gidus said it contained $280,000. Gidus was then asked to open the suitcase. The suitcase contained U.S. currency in the amount of $265,000. An additional $14,980 was found in the glove compartment of the vehicle, and $105 was found in the door pouch. The currency was then impounded by the officers.

6. The officers testified that they found trace residue of marijuana consisting mainly of seeds and stems in the trunk of the defendant BMW. Gidus contends, however, that there was no marijuana in the vehicle and points to the fact that he was not charged with possession of marijuana, that the discovery of the marijuana was not mentioned in one of the officer's reports, and that there was such a small amount of marijuana allegedly found. Mr. Gidus in 1981 had been convicted of possession of 1200 pounds of marijuana with intent to distribute. No evidence was offered to suggest that either of the officers had any motive to lie about the presence of marijuana in the vehicle. The Court accepts the testimony of Officer Shipley that marijuana residue was embedded in the rug of the vehicle's trunk. Officer Shipley testified further that he had collected only a trace amount of residue because he would have

had to vacuum the remaining residue from the rug to retrieve it all. He also explained that he did not charge Gidus with possession of marijuana because it was such a small amount. The Court notes as well that the discovery of the marijuana was documented by Officer Turpin in the incident report he wrote. Moreover, that there was only a trace amount of residue found supports the credibility of Officer Shipley. Any implication that the officers placed it there is not supported by the evidence. Furthermore, Special Agent Armando Marin of the Drug Enforcement Administration testified, and the Court so finds that the presence of residue embedded in the trunk of the vehicle indicated that a larger amount of marijuana had been present in the vehicle's trunk.

7. Eleanor Gidus and Mark Gidus both are named on the title to the defendant BMW. Eleanor Gidus alleges that she gave her son Mark $8,000 towards the purchase of the vehicle although she cannot document the source of the money nor how she could afford to give such an amount to her son. She admitted that prior to 1982, she was a secretary and a bookkeeper and that her income in 1981 was between $8,000 and $10,000. Although Eleanor Gidus claimed that she took the $8,000 from her safe and that she kept most of her savings in a safe, she later testified that she in fact did have a savings account. However, she produced no evidence proving a withdrawal of $8,000 from her account. Moreover, Eleanor Gidus admits that she expected her son to repay the $8,000 only if she needed it. Neither she nor Mark Gidus submitted any document pertaining to a loan given by Eleanor Gidus to her son. She also admitted that the vehicle basically belonged to Mark and that he was the one who exercised dominion and control over it. Accordingly, it is Mark Gidus who stands to suffer from the vehicle's being forfeited.

8. DEA Agent Marin testified that drug traffickers commonly put the title to their conveyances in the names of friends or family members.

9. Eleanor Gidus testified that although she knew about her son's arrest, she did not know about his conviction for drug trafficking. However, she also claimed to be very close to her son and her family and to love her children very much. The Court finds that it is unlikely that Eleanor Gidus did not know about Mark Gidus' 1981 conviction for possession of marijuana with intent to distribute prior to her having loaned him $8,000 in April, 1982, if in fact she did make such a loan.

10. Testimony was offered that Mark Gidus was arrested for attempting to buy 1200 pounds of marijuana worth $302,000 from undercover D.E.A. agents in 1980. In 1981, he was convicted of possession of marijuana with intent to distribute and sentenced to a term of five years probation.

11. Mark Gidus bought the defendant BMW in or about April, 1982, with $13,000 in cash, $8,000 of which was allegedly from his mother and $5,000 of which was said to be from savings kept in his safe. Mark Gidus submitted no documentary proof, such as a bank statement, that he had $5,000 in savings. Moreover, it was he that carried the $13,000 into the car dealership and it was he that selected the car and its accessories and engaged in all negotiations with the dealer.

12. Mark Gidus was employed as a landscaper and car mechanic in 1981, and he earned about $20,000 in that year. He earned approximately $16,000 in 1982.

13. Claimant George Marion testified that $280,000 of the defendant $280,685 belongs to him. He claims that he is a collector and trader of antiques, that sometime in 1979 he bought an antique stein for $8,000, had it polished for $300 and sold it for $280,000 to a Mr. Ullrich of Zurich, Switzerland on July 6, 1982. He does not know the full name or address of Mr. Ullrich nor the name or anything else about the principal on whose behalf Mr. Ullrich allegedly was acting. No documentation was provided nor was any claimed in connection with the sale. As indicated, Mr. Marion testified he gave Mr. Ullrich a receipt. Although the Court finds that George Marion owned a stein, he has failed

to prove by a preponderance of the evidence that he sold it to a Mr. Ullrich from Switzerland on July 6, 1982, in exchange for the defendant currency.

14. While it appears reasonably clear, as indicated, that claimant Marion owned a stein of the type described, he has failed to prove by a preponderance of the evidence that the money in question constituted the proceeds of a sale of the stein. This conclusion makes somewhat academic claimant's proof problems as to valuation of the stein. However, a brief discussion of these problems lends support to the Court's ultimate findings of the fact and law. Mr. Marion conceded the absence of insurance on the stein. Neither had it been appraised. He alleges that his initial asking price for the stein was $300,000, and that he based this figure on the fact that an allegedly similar stein was sold by Christie's of London in 1980 for 72,463 British pounds. He further testified that the value of the pound in 1980 was $2.80, which he contends would have made the sale price of the Christie's stein $202,000. He also testified that a dealer from Christie's had compared a picture of the Christie's stein and a picture of his stein and had advised him that his stein was worth approximately $100,000 more. The Court, however, finds that the true value of the British pound in 1980 was $2.18, which would have made the sale price of the Christie's stein $157,-969.34, considerably less than the $202,000 alleged by George Marion. Moreover, the Court finds questionable the allegation that a dealer from Christie's would have advised George Marion regarding the value of his stein based only on a photograph of it. The evidence going to the comparison of the Marion stein with that of Christie's was insufficient to sustain such a comparison. A comparison of a xerox copy of the Christie's stein with a photograph of George Marion's stein makes quite difficult a conclusion that the latter was similar to or more valuable than the former.

15. The testimony regarding the Ullrich visit to the Marion house and the preceeding and following circumstances would do more justice to a novel of intrigue than as support for a legitimate sale. Apparently, suspecting some sort of "rip-off" claimant's brother covertly watched, armed with a weapon. The money found in the car (necessarily the money provided by Mr. Ullrich) was mostly in $20 bills with a variety of other denominations as well. The car used by Ullrich, said to be a rental, was not identified. There was no evidence that Mr. Ullrich was even seen or heard from again.

16. George Marion further alleges that he was afraid that someone would steal the $280,000 from his home and that he, therefore, wanted a safe place to keep it. In his counterclaim, George Marion alleges that "he was unable to take said money to a banking institution as said institutions were closed and it was imperative that he leave the area forthwith for matters of great personal importance to him." He alleges that he could not have deposited it in the bank the morning after he had received it because he had to leave at 6:00 a.m. on a trip to Busch Gardens, an amusement park. He offered no explanation as to why he could not postpone the trip until 9:00 a.m. so as to be able to deposit the money in a bank nor did he explain why neither his brother nor his son could have deposited the currency in a bank the morning after he had received it. He further stated that he asked his son if he knew of anyone with a house safe and that his son told him that Mark Gidus had such a safe. Mr. Marion's son, George, was not at his father's house on the night of July 6, 1986.

Mr. Marion testified further that he asked Mark Gidus to keep the defendant currency in his floor safe. Gidus had been an employee of George Marion (he had parked cars at Marion's parking concession), and he knew him in that capacity.

17. George Marion admits that he gave the combination of the suitcase which contained the defendant currency to Mark Gidus. Gidus testified that he was given the combination to the suitcase in order to be able to remove the currency from the suitcase and put it in his safe. However, given the dimensions of the safe as testified to by Gidus, and given the dimensions of the suitcase, the Court finds that the suitcase in its entirety would have fit into Gidus'

safe, depending, of course, on what was already there. However, the transaction with Mr. Gidus suffers from additional weakness.

18. Of the defendant currency, $14,980 was found in the glove compartment of the defendant vehicle by Officers Shipley and Turpin. Mark Gidus admitted that upon receiving the suitcase from Marion and putting it into his vehicle, he opened it, removed an amount of currency and put it in the glove compartment. He did not recall how much money he had taken. He further testified that he had taken it in order to count it and intended to put it back. This explanation lacks credibility.

19. On July 6, 1982, Mark Gidus lived at 14910 N.E. 2nd Avenue. At that time, George Marion lived at 590 North Biscayne River Drive. Mark Gidus admits that the location at which he was initially seen by the police, 140th Street and N.W. 5th Avenue, was not directly on the way to his house. He testified he took an indirect route home because he feared that someone was going to follow him. Again, this explanation is not persuasive. If no drug deal was involved, why would Gidus, presumably unknown to the purchaser of the stein, (and who had left) take any but a direct route to his home? Indeed, prolonging this trip would seem inadvisable. The Court has examined a map of the area and finds that the location at which Gidus was first observed by the police was a distance from the direct route between his house and George Marion's. Given that he was transporting such a large amount of currency, and given that Gidus was unable to explain why someone would have been any less likely to have followed him if he had taken an indirect route home than if he had taken a direct route home, the Court further finds Gidus' explanation as to why he did not go directly to his house not credible.

20. Of considerable interest is the fact that ten of the $100 bills in the currency seized had been used by Special Agent Steve Bissegger of the Drug Enforcement Administration in Albuquerque, New Mexico to buy cocaine from Thedore Sadock on December 24, 1981. According to Special Agent John Howard of the U.S. Customs Service, when the defendant currency was separated into four packages, Chessie the narcotics dog alerted on each package, indicating that the currency had been near narcotics. At trial, Chessie also alerted to the suitcase which had contained the currency.

21. Mark Gidus admitted that George Marion's son George was in 1981 and 1982, and is now a good friend of his. He also admitted that George, Jr., knew about his conviction for marijuana trafficking at the time he was convicted in 1981. George Marion, Jr., testified that he had not known about Mark Gidus' conviction in 1981. He further testified that he had gone to his father's house on the night of July 6, 1982. As recently as the taking of his deposition on July 20, 1984, he had thought that his grandmother and uncle were at the house at that time as well. He admitted, however, that upon talking with his uncle, he remembered that in fact neither his grandmother nor his uncle had been at his father's house when he had been there. Upon the government's attempting to discredit George Jr.'s testimony, George Marion, Sr. testified that his son was mistaken and that he had not come to his house on the night of July 6, 1982. For this reason, as well as young Marion's testimony generally, I find that it does not support the claimant's position.

22. The defendant currency consisted of approximately 15 one dollar bills, 41 five dollar bills, 652 ten dollar bills, 6,728 twenty dollar bills, 750 fifty dollar bills, and 1016 one hundred dollar bills and an additional $105 found in the door pouch of the defendant BMW, the denominations of which are unknown. Agent Marin testified, and the Court so finds, that currency from transactions involving marijuana usually consists of small denominations, such as 5's, 10's and 20's. George Marion and his brother Nick testified that the defendant currency was packaged in bundles of $5,000 and $10,000. Nick Marion admitted that he had discussed with his brother George his testimony prior to his (Nick Marion's) taking the stand. Officer Shipley testified, and the Court so finds, that

when he counted the defendant currency after having seized it from Mark Gidus, the currency was not uniformly packaged and was segregated in amounts varying from a few hundred to several thousand dollars. I accept the testimony of the officer, though, in view of the denominations, the way the money was bundled is not particularly relevant.

23. Mark Gidus testified that the $105 found by Officers Shipley and Turpin in the door pouch of the defendant vehicle belonged to him. Accordingly, because George Marion is claiming only $280,000 of the defendant currency, $580 of it remains unaccounted for. Upon Officer Shipley's commenting to Mark Gidus after his arrest that he had never seen such a large amount of cash, Mark Gidus stated that he had seen such a large amount of cash on previous occasions.

## CONCLUSIONS OF LAW

1. The plaintiff, the United States of America, predicates its claim of federal jurisdiction in this matter on Title 28, United States Code, Sections 1345 and 1355.

2. To contest a forfeiture action, an individual must first demonstrate an interest in the seized property sufficient to satisfy the court of his standing as claimant. *United States v. Three Hundred Sixty Four Thousand Nine Hundred Sixty Dollars, ($364,960) in U.S. Currency,* 661 F.2d 319, 326 (5th Cir.1981). This burden is on the claimant. *Rakas v. Illinois,* 439 U.S. 128, 130–31 n. 1, 99 S.Ct. 421, 423–24 n. 1, 58 L.Ed.2d 387 (1978). In general terms, ownership may be defined as a possessory interest in the seized property from which flows the right to exercise dominion and control. *United States v. One 1945 Douglas C-54 (DC-4) Aircraft,* 604 F.2d 27, 28 (8th Cir.1979). However, "[t]he possession of bare legal title to the res may be insufficient to establish ownership" where, for instance, the title holder is only a nominal owner. *Id.* at 28–29; *see also United States v. One 1945 Douglas C-54 (DC-4) Aircraft,* 647 F.2d 864, 866–867 (8th Cir. 1981).

3. Eleanor Gidus, Mark Gidus' mother, has no standing to contest the forfeiture of the defendant BMW because she is merely a nominal owner of the vehicle. Eleanor Gidus has not demonstrated by a preponderance of the evidence an interest in the seized property sufficient to satisfy the Court that she has standing, notwithstanding the fact that title to the vehicle is in her name as well as that of her son's. The government has shown that there are several serious reasons to doubt Eleanor Gidus' right to the defendant BMW, and she has failed to rebut any of them. Although Eleanor Gidus claims that she gave her son $8,000 towards payment of the defendant vehicle, she cannot document from where she obtained the money nor how she could afford to give her son such a substantial sum. Moreover, assuming *arguendo* that Eleanor Gidus did give her son $8,000, it appears the money was a gift rather than a loan. The payment of money, however, cannot be both a loan and a gift at the same time, as the mother contends. It must be one or the other. It was Eleanor Gidus' understanding that the money was to be paid back only if she needed it. That is not the definition of a loan. When money is lent, as opposed to given, there is normally a clear understanding that the money will be paid back. As there was no such understanding in this case, I conclude the money was a gift, not a loan. Furthermore, Eleanor Gidus herself admitted at trial that the defendant BMW belongs to Mark Gidus and that he was the one who used it. She also admitted that it was Mark Gidus who carried the $13,000 in cash into the car dealership and that she merely signed the sale documents. Therefore, although the vehicle is registered in Eleanor Gidus' name as well as that of her son Mark Gidus, Eleanor Gidus is not the true owner of the vehicle and, therefore, has no standing to contest its being forfeited. *United States v. One 1981 Datsun,* 563 F.Supp. 470 (E.D.Pa. 1983) (claimant did not have standing to contest forfeiture of vehicle because despite fact that he had title to it, he had not paid for it and had not exercised dominion and control over it); *United States v. One*

*(1) 1982 39' Vessel Named Un Lucero del Mar,* Case No. 83–2126–CIV–CA (April 9, 1984).

■ 4. If a claimant is able to establish his standing, then it is the government's burden to show that probable cause exists for the belief that there is a substantial connection between the property to be forfeited and the criminal activity defined by the statute under which the suit is brought. *United States v. $364,960 in U.S. Currency, supra,* 661 F.2d at 323. *See also United States v. One 1971 Chevrolet Corvette Automobile,* 496 F.2d 210 (5th Cir.1974).

5. Probable cause is defined as a reasonable ground for belief of guilt supported by less than *prima facie* proof but more than mere suspicion. *United States v. $364,960, supra,* 661 F.2d at 323; *United States v. One 1978 Chevrolet Impala,* 614 F.2d 983, 984 (5th Cir.1980); *United States v. One 1975 Ford F–100 Pick-up Truck,* 558 F.2d 755, 756 (5th Cir.1977); *United States v. One 1971 Chevrolet Corvette Automobile, supra,* 496 F.2d at 212.

6. Once the government shows probable cause to believe the defendant property was involved in unlawful activity, the burden of proof shifts to the claimant and forfeiture is proper unless a party with standing proves a defense by a preponderance of the evidence. *United States v. One 1975 Ford F–100 Pickup Truck, supra,* 558 F.2d at 756; *United States v. One 1983 Wood, 19 Foot Custom Boat,* 501 F.2d 1327 (5th Cir.1974).

■ 7. The plaintiff has demonstrated probable cause to believe that the defendant vehicle violated 21 U.S.C. § 881(a)(4) and (6). Title 21, United States Code, Section 881(a)(4) provides, in pertinent part, for the forfeiture of "[a]ll conveyances, including ... vehicles ... which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of [all controlled substances which have been manufactured, distributed, dispensed or acquired in violation of Title 21]." Title 21, United States Code, Section 881(a)(6) provides, in pertinent part, for the forfeiture of "[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person for a controlled substance in violation of this subchapter [and] all proceeds traceable to such an exchange...."

8. When the defendant BMW was seized by Dade County police officers in Miami, on July 6, 1982, it possessed marijuana residue. Thus, the defendant vehicle facilitated the receipt, possession and concealment of a controlled substance and contraband article in violation of 21 U.S.C. § 881(a)(4). Therefore, the plaintiff has met its burden of establishing probable cause to justify the seizure of the defendant vehicle and the institution of this forfeiture action.

■ 9. The claimants, Mark and Eleanor Gidus have failed to meet their burden of proving by a preponderance of the evidence a defense to the forfeiture of the defendant vehicle. Assuming *arguendo* that Eleanor Gidus has standing to contest the forfeiture of the defendant BMW, her claim must fail because she knew or should have known that her son Mark had been arrested for and convicted of possession of marijuana with intent to distribute prior to her allegedly having given him the $8,000 with which to purchase the vehicle in April, 1982. Her claim to the contrary is not credible. Moreover, she did nothing to prevent his using the vehicle, and in fact admitted that it was his. Therefore, her claim of innocence cannot be legally supported. *See United States v. One 1973 Buick Riviera Automobile,* 560 F.2d 897, 901 (8th Cir.1977) (defense of innocence not available to owner of vehicle where owner knew that his son had been arrested for a narcotics offense, and where he allowed his son to operate vehicle with little restriction and did nothing to prevent the proscribed use of his property). At least (and assuming she had no knowledge of his activities) she is not in the position of one who lends another a vehicle without any reason to believe it may be misused.

■ 10. Mark Gidus' claim of innocence must fail because, as explained *supra,* he failed to refute the fact that marijuana

residue was found in the trunk of the BMW. The location of the marijuana in the trunk and the nature of the residue establish that the vehicle had been used to transport marijuana. This conclusion is buttressed by Mark Gidus' conviction for possession of 1200 pounds of marijuana with intent to distribute in 1981.

11. To justify the forfeiture of the defendant vehicle pursuant to 21 U.S.C. § 881, the government need only show probable cause to believe that the vehicle was used "to facilitate the ... possession" of a controlled substance. 21 U.S.C. § 881; *United States v. One 1975 Ford F100 Pick Up Truck*, 558 F.2d 755. Marijuana is a controlled substance pursuant to 21 U.S.C. § 812(c), Schedule I(c)(10).

■ 12. The application of this section "is not dependant on the quantity of the controlled substance found." *United States v. One 1977 Chevrolet Pickup VIN CKL147J107642, Its Tools and Appurtenances*, 503 F.Supp. 1027, 1030 (D.Colo. 1980) (defendant vehicle forfeitable even though it carried only one ounce of cocaine). Even the possession of a minute amount of drugs will support forfeiture. *United States v. One 1974 Cadillac Eldorado*, 548 F.2d 421, 425 (2d Cir.1977) ("the transportation of any quantity of drugs, however minute is ... sufficient to merit the forfeiture of the vehicle....")

13. Moreover, even in the unlikely event that the marijuana in the trunk of the defendant BMW had been used for personal purposes, the vehicle would still be forfeitable. In *United States v. One 1971 Porsche Coupe Automobile, Vehicle Identification No. 9111100355*, 364 F.Supp. 745, 748–49 (E.D.Pa.1973), the court rejected the claimant's contention that the vehicle seized there should not be forfeited "since it was carrying only an amount of narcotics suitable for personal use of an addict." The court cited the language of 49 U.S.C. §§ 781 and 782 and 21 U.S.C. § 881, and then stated as follows:

Given this sweeping statutory language, it is impossible to concede that Congress was concerned only with large scale trading in narcotics. The intent is clearly expressed to make unlawful (and therefore subject to forfeiture) the use of any vehicle for transporting, concealing or possessing *any* contraband article, and further to make unlawful the use of any vehicle to *facilitate* concealment, possession, purchase sale, etc., of any contraband article. The statute clearly requires forfeiture where any contraband article has been physically within the vehicle.

364 F.Supp. at 749 (emphasis in original).

14. The court, in concluding that forfeiture was appropriate, relied on the Fifth Circuit cases of *Associates Investment Co. v. United States*, 220 F.2d 885 (5th Cir. 1955) and *United States v. One 1957 Oldsmobile*, 256 F.2d 931 (5th Cir.1958), both of which are dispositive here as well. In *Associates Investment Co.* forfeiture was ordered when two partially smoked marijuana cigarettes were found in a vehicle. Interpreting 49 U.S.C. §§ 781–82, the court concluded that "[t]he statute by its terms subjects the vehicle to forfeiture if contraband is concealed or possessed in that vehicle." 220 F.2d at 887.[2] The court noted that neither transportation nor concealment or possession on more than one occasion need be shown. *Id.* In *One 1957 Oldsmobile* the trial court had held that it would be "unconscionable" and "very wrong" to forfeit a vehicle from an innocent owner merely because someone who was in his car possessed a "very small quantity" (13 grams from which 4 to 9 cigarettes could be made) of marijuana. The Fifth Circuit, however, ordered the forfeiture of the vehicle, noting, *inter alia*, that they had "previously held in *Associates Investment Co. v. United States*, 5 Cir. 220 F.2d 885, that the smallness of the quantity of the marijuana transported or concealed is not a basis for granting remission." 256 F.2d at 933. *Accord Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct.

---

**2.** Although forfeiture is being sought pursuant to 21 U.S.C. § 881, the language of that statute is

just as sweeping as 49 U.S.C. § 781.

2080, 40 L.Ed.2d 452 (1974); *United States v. One 1975 Ford F100 Pickup Truck, supra,* 558 F.2d at 756 (seizure of truck upheld where truck had transported an individual who had had a small bottle containing two grams of cocaine concealed in one of his socks).

15. Moreover, although the vehicle would be forfeitable even if the marijuana found therein had been for personal use only, that the marijuana was found in the trunk of the vehicle and that it consisted mainly of seeds and stems suggests that the defendant BMW had been used to transport a larger quantity of marijuana. Therefore, the vehicle is forfeitable pursuant to 21 U.S.C. § 881(a)(4).

16. On the question of the claimants' motion to suppress, the late filing of it would be sufficient basis for denial. It is not, however, necessary to base a denial on that ground.

■■■■ The Motion to Suppress is denied because evidence seized by state criminal law enforcement officers in good faith, but nonetheless illegally, is admissible in civil actions brought by or against the United States. *United States v. Janis,* 428 U.S. 433, 459–60, 96 S.Ct. 3021, 3034–35, 49 L.Ed.2d 1046 (1976). A forfeiture action is a civil action. *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 104 S.Ct. 1099, 1107, 79 L.Ed.2d 361 (1984) ("What overlap there is between [the forfeiture sanction and the criminal sanction] is not sufficient to persuade us that the forfeiture proceeding may not legitimately be viewed as civil in nature."). The defendant currency was seized by two Dade County Police officers who testified that they seized the currency after they had placed Mark Gidus under arrest and in the good faith belief that they had a right to seize the currency. The court finds their testimony credible. Accordingly, assuming *arguendo* that the seizure of the currency was illegal, it is nevertheless admissible in this action.

17. Alternatively, the Motion to Suppress is denied because the search of the defendant BMW and the suitcase found on the left rear floorboard therein was valid because it was conducted pursuant to a lawful custodial arrest. "[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile ... [and] may also examine the contents of any containers found within the passenger compartment for if the passenger is within reach of the arrestee, so also will containers in it be within his reach." *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981) (footnotes omitted). *Accord, United States v. United States Currency Totaling $87,279 and Cashier's Checks Totaling $15,000,* 546 F.Supp. 1120, 1126 (S.D.Ga. 1982). There has been no challenge to the validity of Gidus' arrest. It was a lawful custodial arrest for reckless driving and willfully fleeing a police officer.

18. The facts of this case are almost identical to the facts in *Belton* and in *$87,279.* In *Belton* a policeman overtook a speeding vehicle, stopped the vehicle, and asked to see the driver's license and automobile registration. 453 U.S. at 455, 101 S.Ct. at 2861. The police officer smelled burnt marijuana and saw on the floor of the vehicle an envelope marked "Supergold" that he associated with marijuana. He directed the four men in the car to get out and placed them under arrest for the unlawful possession of marijuana. He patted down each of the men and separated them to insure that they would not be in physical contact with each other. He determined that the "Supergold" envelope contained marijuana, read the arrestees their *Miranda* rights, and searched each of them. The officer then searched the passenger compartment of the car. On the back seat he found a black leather jacket, unzipped one of its pockets and discovered cocaine. He placed the jacket in his automobile and drove the arrestees to a nearby police station. *Id.* at 456, 101 S.Ct. at 2862. The Supreme Court upheld the search because it was made pursuant to a lawful custodial arrest.

19. In *United States v. United States Currency Totaling $87,279 and Cashier's*

*Checks Totaling $15,000, supra,* a state patrolman pulled over a vehicle travelling at the speed of 84 miles per hour and arrested the driver of the vehicle for speeding and driving under the influence. Pursuant to the arrest, the officer searched the car and discovered two paper bags, each filled with cash. 546 F.Supp. at 1123. Relying on *New York v. Belton, supra,* the Court held the search lawful, stating that "[o]nce [the officer] had made a determination to place [the driver] under arrest for speeding and for driving while intoxicated ... the Trooper was justified in searching the passenger compartment of the vehicle." *Id.* at 1126.

 20. In this case, two Dade County officers overtook a speeding vehicle, stopped it, placed the driver under arrest, and gave him his *Miranda* warnings. The officers then conducted a safety search of the vehicle, and found on the left rear floorboard, a metal suitcase of the kind which is used to contain weapons. When the driver was not forthcoming as to who owned the suitcase and when he finally admitted that it contained $280,000, he was directed to open it. The search here was valid because, as were the searches in *Belton* and *$87,279,* it was conducted pursuant to a lawful custodial arrest.

 21. The Motion to Suppress is also denied because Mark Gidus knowingly and voluntarily consented to the search of the suitcase containing the currency. A search may be made without a warrant and without probable cause if the person in control has given voluntary consent. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The burden of proof with regard to the voluntariness of consent rests with the plaintiff

by "clear and positive" proof. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968); *United States v. Jones,* 641 F.2d 425 (6th Cir.1981). However, the voluntariness standard for a waiver of Fourth Amendment rights is less stringent than is required for a waiver of Fifth and Sixth Amendment rights because warrantless searches do not detract from the accuracy or reliability of the fact-finding process. *Schneckloth v. Bustamonte, supra,* 412 U.S. at 241, 93 S.Ct. at 2055.

 22. Whether voluntary consent has been given is a factual question which the Court must resolve. *United States v. Scott,* 578 F.2d 1186 (6th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 201, 58 L.Ed.2d 182 (1978). In making that decision the Court must examine the totality of the circumstances. *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980).

 23. In examining the totality of circumstances, relevant factors to consider include, but are not limited to:

(a) the age of the person giving consent;

(b) education and intelligence;

(c) mental and physical condition;

(d) whether the defendant is under arrest or in custody;

(e) place where consent is given, *e.g.,* in a police station versus in the suspect's home;

(f) whether the defendant has been advised of the right to refuse consent;[3]

(g) the defendant's performance of cooperative acts;[4]

(h) whether police falsely claim possession of a warrant;[5]

(i) the nature of the police behavior.[6]

---

**3.** The Supreme Court, however, has held that knowledge of the right to withhold consent is not a prerequisite to voluntary consent, *Schneckloth v. Bustamonte, supra,* 412 U.S. at 234, 93 S.Ct. at 2051, and, accordingly, failure to inform a person of his right to refuse consent does not necessarily render consent involuntary.

**4.** *See, United States v. Sanchez,* 635 F.2d 47, 60 (2d Cir.1980) (consent found voluntary where

defendant failed to object to entry and instructed son to open door).

**5.** *Bumber v. North Carolina, supra,* 391 U.S. at 548–49, 88 S.Ct. at 1791–92 (1968) (consent involuntary because police falsely claimed possession of a warrant).

**6.** In *United States v. Bramble,* 641 F.2d 681 (9th Cir.1981), voluntary consent was found despite coercive police behavior. The Court found that

No single factor is dispositive. In fact, consent can be voluntary even though an officer fails to identify himself as a law enforcement agent. *United States v. Bullock*, 590 F.2d 117 (5th Cir.1979).

24. An examination of the factors in this case demonstrates that Mark Gidus knowingly and voluntarily consented to the opening of the suitcase which contained the defendant currency. Mark Gidus was capable of giving consent at the time of his arrest. He was in his mid-twenties, had attended college, was in good physical condition and was not intoxicated. Although he was under arrest, he was not incarcerated and in fact was standing in the driveway of the home of an acquaintance. The officers did not intimidate Gidus or physically abuse or threaten him. They informed him that if necessary, they would obtain a search warrant to ascertain what was in the suitcase. It was Mark Gidus who opened the combination lock of the suitcase which the officers did not know. Given Mark Gidus' likely familiarity with law enforcement officers, given the vehement denial of the officers in this case that they in any way threatened him, and given Mark Gidus' admission that they did not threaten to harm him, this Court holds that Mark Gidus' consent was voluntarily given. Mark Gidus' allegation that the officers threatened to "bust open" the suitcase (as opposed to threatening to hurt him physically) does not justify his contention that he was "forced" to open the combination lock, because he could not have been harmed by or have suffered in any way from the officers' forcing the suitcase open. *See United States v. Turner*, 628 F.2d 461 (5th Cir.1981); *United States v. Hall*, 565 F.2d 917 (5th Cir.1978).

26. The Motion to Suppress is also denied because the currency inevitably would have been legally discovered. When "the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible." *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Furthermore, the inventory search constitutes a well-defined exception to the warrant requirement. *South Dakota v. Operman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (search of contents of glove compartment of automobile lawfully impounded upheld because search protected owner's property while in custody of police and protected police against possible false claims of theft); *United States Currency Totaling $87,279 and Cashier's Check Totaling $15,000, supra*, 546 F.Supp. at 1126. Despite Mark Gidus' protestations to the contrary, after he had been arrested, the defendant BMW properly was impounded and its contents searched. Pursuant to that procedure, the currency would have been discovered inevitably. It is, therefore, admissible. *See Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 2611, 77 L.Ed.2d 65 (1983) ("it is not 'unreasonable' for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures"). *Accord, People v. Gonzalez*, 53 L.W. 1011 (N.Y.1984) (once police officers had lawfully arrested driver and impounded his car, their stationhouse inventory of vehicle could properly extend to search of closed paper bag found inside).[7]

non-coerced actions by the defendant demonstrated voluntary consent even though two police officers held guns on the defendant, handcuffed him, and laid him on the floor. A third officer picked him up and placed him in a chair. The defendant then consented to the search of his car, which the officers wanted to search anyway, because he was concerned about his dog inside the vehicle.

**7.** Assuming *arguendo* that the search and seizure of the currency was illegal, and assuming arguendo that evidence illegally seized by state officers may not be admitted in a federal forfeiture action, if enough legally obtained evidence exists to prove the currency is forfeitable, the fact that the currency was illegally seized is no defense. *United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *Trupiano v. United States*, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948); *The Ship Richmond v. United States*, 13 U.S. (9 Cranch) 102, 3 L.Ed. 670 (1815); *United States v. Carey*, 272 F.2d 492 (5th Cir.1959); *Grogan v. United States*, 261 F.2d 86 (5th Cir. 1958). As explained *infra*, this case is replete with evidence other than the defendant curren-

26. The facts of this case, when considered as a whole, establish probable cause to believe that the defendant currency was the proceeds of narcotics trafficking and should be forfeited pursuant to 21 U.S.C. §§ 881(a)(6) and 882. Probable cause may be based on circumstantial evidence. *United States v. Thirteen Thousand Dollars in U.S. Currency,* 733 F.2d 581, 585 (8th Cir.1984); *United States v. $93,685.61 in U.S. Currency,* 730 F.2d 571, 572 (9th Cir.1984); *United States v. $364,960 in United States Currency, supra.* Moreover, that the currency consisted of small denominations further buttresses the conclusion that the currency was the proceeds of narcotics trafficking. Had Mr. Ullrich gone to a bank to obtain the $300,000, allegedly requested by George Marion, it is very doubtful that he would have been given currency which consisted of 1's, 5's, 10's and 20's as does the currency at issue. A reasonable individual under those circumstances would have requested bills in large denominations to facilitate transporting that large a sum of currency. More likely, he would have obtained a cashiers check or arranged to write a check. As will be hereafter outlined, all of the circumstances point to this money as contraband. Indeed, there were very few "natural" or usual aspects of this transaction.

27. The fact that marijuana residue consisting mainly of stems and seeds was found embedded in the trunk of the vehicle where the currency was discovered also supports the conclusion that the currency was drug money. As noted *supra,* the presence of the marijuana in the trunk proves that the vehicle had been used to transport a larger quantity of marijuana. *United States v. One Machine For Corking Bottles,* 267 F. 501, 503 (W.D.Wash. 1920) ("[t]he money and the check were found in such a relation to the contraband articles and apparatus, from which a clear inference can be made to justify the conclusion that it was the proceeds of the illegal enterprise, and used in the operation, and carrying forward of such business."

28. Mark Gidus' behavior in fleeing from the police also indicates the illegal nature of the currency. Officer Shipley testified that upon Mark Gidus' seeing the police vehicle, he accelerated, ran a stop sign and drove in a reckless manner endangering the life of at least one pedestrian in an attempt to flee from the police, even though at least the lights and possibly the siren of the police unit were operating. Mark Gidus ultimately pled guilty to careless driving. The mere fact that he had such a large amount of currency in the car, were it legitimate, does not adequately explain his attempting to flee from the police. The conduct of Mark Gidus at the arrest scene, his equivocal responses, evasion and reluctant cooperation all lend support to the illegitimate nature of the transaction. At that point, at least, there can be no suggestion that he thought he was being waylaid by bandits and, indeed, he never so claimed.

29. Although the presence of one or two one hundred dollar bills that had been used in a previous D.E.A. cocaine buy just six months prior to the incident at issue may be explained by mere coincidence, the presence of 10 such one hundred dollar bills cannot be, especially in conjunction with all the other evidence in this case which indicates that the defendant currency is drug money. Were they one dollar bills instead of one hundred dollar bills, the implication might not be so serious because one dollar bills have a very high turnover rate. The same cannot be said for one hundred dollar bills.

30. Despite George Marion's protestations at trial of what an honest and nice "kid" Mark Gidus is, Mark Gidus is in fact a convicted narcotics trafficker. He was convicted in 1981 of possession of 1200 pounds of marijuana with intent to distribute. In fact he admitted to Officers Shipley and Turpin that he had seen large amounts of currency such as that at issue before.

31. Mark Gidus' story that he did not go directly home from George Marion's house because he was afraid that someone

---

cy that establishes the probable cause necessary to justify forfeiture.

would follow him is not credible because he offers no explanation as to why someone would be less likely to follow him if he took an indirect route than if he had taken a direct route. If the claimants were telling the truth, it would be reasonable to assume that Mark Gidus would not have been in the area where he was first found by the police officers because that area was not directly en route from George Marion's house to his. That he was found there indicates that he is not telling the truth and that he was not transporting the currency to his house. In fact, Mark Gidus admitted to the arresting officers that he had just come from the Cricket Club, not from the home of a friend. For all of these reasons, I find that the government has established probable cause to believe that the defendant currency is or was going to be the proceeds of a narcotics transaction.

32. I find further that the claimant Marion has failed to establish by a preponderance of the evidence that the defendant currency is the proceeds of the stein sale. As already discussed, there are simply too many unusual aspects of this series of events. There is zero documentation to evidence the sale. While the burden became that of claimant, he did not produce "Mr. Ulrich" for the trial or before by deposition. It is incredible that a self-made millionaire such as George Marion would have no proof that he had sold an antique stein for $280,000. Also difficult to understand, is George Marion's story regarding his alleged sale of the stein. He testified that he had disseminated at least one hundred pictures of the stein throughout England, France, Italy, Greece and Beverly Hills. He testified that he had offered it to Bunker Hunt and to the J. Paul Getty Museum. According to George Marion, however, no one made him an offer until a Mr. Ullrich from Switzerland called him in June, 1982. George Marion admits that he did not go to Switzerland, yet alleges that the first and only person from whom he had received an offer was Mr. Ullrich, and that the first price he quoted Mr. Ullrich was $300,000, notwithstanding the fact that he had invested a mere $8,300 in the stein. George Marion offered no explanation as to

how someone in Switzerland could have seen a picture of the stein.

33. The picture from Christie's of a stein that looks similar to the stein allegedly owned by George Marion and that was sold for approximately $157,000 in 1980 does not establish that the two steins were sufficiently similar to warrant being sold for the same or a similar price. George Marion offered no expert or other adequately documented testimony from which the Court could reasonably believe that the stein he allegedly owned was worth $300,000. The Court finds it strange that George Marion did not have so valuable an antique appraised, especially since he was attempting to sell it. It is equally puzzling that George Marion did not insure the stein, given its value and given his admitted fear of being robbed, as shown by the deadbolt on the doors to his home and the alarm system in his house. That Mr. Marion has no persuasive documents whatsoever relating either to the true value or to the sale of the stein, including the business card of Mr. Ullrich which has been lost, and that he doesn't remember Mr. Ullrich's first name, his address or telephone number, or the name of the principal on whose behalf he was acting, also militate with the other unusual aspects of the sale to the conclusion that the source of the currency is not from the sale of an antique stein. I am unpersuaded by the copies of letters offered to support the sale.

34. I find it difficult to understand, and thus to accept why claimant would have insisted, by telephone, that the transaction be completed in cash. His concern about robberies would suggest that almost any other method and place for completing a legitimate transaction would have been indicated. Also interesting, is the nature of the money allegedly produced by Mr. Ullrich. Some of the bills had been marked and used in an earlier drug deal. We must also recall the positive reaction of the cocaine trained dog. Additionally, I find equally difficult to understand why Mr. Ullrich, not having seen the stein and not knowing claimant, would go to a private

home with the substantial sum in question to transact a sale not involving paperwork.

35. Although claimant admitted having testified at his deposition that he would go to Switzerland to locate Mr. Ullrich, he did not do so. He stated he called Zurich, Switzerland to obtain Mr. Ullrich's telephone number and address and thereafter did not press the matter upon allegedly being told that there were several Ullrich's in Zurich. The effort seems seriously wanting given what was at stake. Assuming Mr. Ullrich does, in fact exist, then a reasonable person of George Marion's means and apparent intelligence would have presumably felt it necessary to go to Switzerland to seek Mr. Ullrich's assistance, not merely for the sake of obtaining the return of his money, but to make it clear to everyone that the money was not involved in any illicit transaction. It is interesting also that no one by the name of Ullrich had declared $300,000 to Customs in the year prior to July 1982. Although there was testimony that two individuals named Ullrich had entered this country in early 1982, these individuals could not have been the Ullrich who allegedly bought George Marion's stein because George Marion first spoke to Mr. Ullrich on June 1, 1982, after the two individuals named Ullrich, neither of whom had declared more than $10,000, had entered this country.

36. Claimant's reason for asking Mark Gidus to put the money in his floor safe (the early a.m. trip to Busch Gardens) is also wanting. One can discern reasons for not wanting to bank money (none good) but in a transaction which was totally legitimate it would have been reasonable and indicated to have the brother or son deposit the money as soon as possible. George Marion's contention that he entrusted $280,000 to a young man whom he barely knew and asked him to keep it in his floor safe because he could not bear the thought of keeping the money in his house even overnight, even though his brother had a .32 caliber gun, there were deadbolts on the doors and an alarm system in the house, diminishes the persuasiveness of his position and points to the defendant currency as the proceeds of an illicit transaction.

37. The Court is also puzzled and troubled by the delay of one month in George Marion's claiming the defendant currency. Were the facts as alleged, it does not seem reasonable that a legitimate business man whose $280,000 he had legitimately earned, and which had been seized by the federal government, would wait a full month before contacting the appropriate authorities to claim the currency and to explain to them the circumstances regarding its source in order to obtain its return.

38. While it is possible the transaction went as described, it is not probable. As indicated, there are too many inconsistencies and bizarre aspects of the transaction. For example, it is likely that a person of claimant's means and experience would entrust $280,000 in cash to a young man who knew nothing about the matter? Significant is the almost $15,000 found in the glove compartment of the car (which had come from the total proceeds). Mr. Gidus' explanation that he was counting the money is almost fanciful unless, of course, and which appears likely, he was counting a payment to him for some services rendered. Why, otherwise, would he have been counting monies entrusted to him in a locked case to be placed in a safe?

39. Another unanswered question is why Mr. Gidus did not call George Marion on the night in question after the arrest. Presumably the matter could have been explained. The arrest was made in the driveway of one Michael Logan, an acquaintance of Gidus' and apparently his barber. Efforts by police to arouse someone in the house were unavailing (even though a person had been seen entering shortly before). The next day Marion's son was called but apparently Gidus made no effort to call Marion Sr. in Tampa.

40. Other signposts directing the Court to the forfeiture conclusion include the demeanor of George Marion, Jr., whose testimony was in conflict with others on important points. For example, young Marion testified that he had not known of Mr. Gidus' marijuana conviction in 1981. Gidus testified he had. His presence at the house

on July 6th was in issue. One must ask, why these contradictions? Perhaps his apparently spontaneous statement when leaving the courtroom on the second day of trial gives us direction. He stated to Government representatives "take good care of the money because I'm bringing it home tomorrow." Was it his? Is his father providing a reason for recovery? It was brought out that Mr. Marion never reported the significant gain on his tax returns. He explained this on the basis of the government having the money.

The complex of facts, including the claimants' position suggest the conclusion that the money in question was the proceeds of a drug transaction. The location when found, with whom when found, the nature of the bills, the marijuana seeds in the trunk, the flight from the officers, the reaction of the dogs, and interestingly, the fact that certain of the bills had been marked and used in a prior drug transaction, call for this conclusion. The explanation for the money offered by claimants and his witnesses only reinforces the conclusion and fails to meet the burden imposed on claimant. Thus, and because of the reasons stated above, the defendant BMW and currency are forfeited to the United States and are delivered into the possession of the Drug Enforcement Administration, Miami, Florida, for disposition according to law, and the claimant's Counterclaim and motion for interest on the defendant currency are hereby denied. A final judgment of forfeiture will be issued by separate order.

FINAL JUDGMENT OF FORFEITURE

This action came on for trial before the Court, the undersigned Judge presiding, and the issues having been duly tried and a decision having been duly rendered in the Court's separate order containing Findings of Fact and Conclusions of Law issued this date, it is

ORDERED, ADJUDGED AND DECREED that the defendant TWO HUNDRED EIGHTY THOUSAND SIX HUNDRED EIGHTY FIVE DOLLARS ($280,-685.00) in U.S. Currency and the defendant 1982 BMW 528E automobile be condemned as forfeited to the United States of America; it is further,

ORDERED, ADJUDGED AND DECREED that the claimants' Counterclaim and motion for interest on the defendant currency be and hereby are denied, and dismissed.